**536**

John LORMAND, Plaintiff-Appellant,
Cross-Appellee,

v.

The SUPERIOR OIL COMPANY,
Defendant-Appellee,
Cross-Appellee.

and

ARIES MARINE CORPORATION, Defendant-Appellee, Cross-Appellee,
Cross-Claimant-Appellant,

v.

INTERNATIONAL MOORING & MARINE, et al., Defendants-Appellees,
Cross-Appellants, and Defendants in
Cross-Claim-Appellees.

No. 85–4278.

United States Court of Appeals,
Fifth Circuit.

June 5, 1987.

Robert R. McBride, McBride, Foret, Rozas & Leonard, Lafayette, La., for plaintiff-appellant, cross-appellee.

John A. Bivins, Lafayette, La., for Fidelity & Cas. Ins. Co. of New York.

Henry S. Provosty, David L. Carrigee, Atty., New Orleans, La., for Aries Marine.

William H. Syll, Jr., Dan A. Spencer, Roxanne Armstrong, Houston, Tex., Donald R. Abaunza, Don K. Haycraft, New Orleans, La., for Superior Oil.

John A. Bivins, Lafayette, La., for International Mooring.

Before BROWN, RUBIN, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant John Lormand (Lormand), injured his back while working as a welder on jack-up vessel RAM–V, which was located in the Gulf of Mexico off the coast of Louisiana. His injuries allegedly occurred when the vessel's gangway, on which he stood, fell. Based on its determination that Lormand was not a seaman and, therefore, was ineligible to recover under the Jones Act, 46 U.S.C. § 688, the district court granted summary judgment in favor of Lormand's employer, International Mooring & Marine, Inc. (IMM), dismissing IMM as a defendant. Following a bench trial on the remaining issues, the district court held that neither the vessel owner, Aries Marine Corporation (Aries), nor the platform owner, Superior Oil Company (Superior), was liable for Lormand's injury. In his appeal to this Court, Lormand asserts that he raised a genuine issue of material fact regarding his status as a seaman under the Jones Act and, therefore, that the district court erred in granting summary judgment for IMM. Lormand also contends that the captain of the vessel negligently caused his injury by failing to ensure that the gangway was secured and that, therefore, the district court erred in dismissing his claim against Aries under section 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). We hold that the district court was correct in determining that, as a matter of law, Lormand was not a seaman, and that its finding of no negligence on the part of Aries was not clearly erroneous.[1] Accordingly, we affirm the district court's dismissal of Lormand's claims for relief.

**Facts and Proceedings Below**

IMM hired Lormand in January 1980 to work as a welder in its Construction Division. From the date he was hired until he was injured in November 1982, Lormand worked a total of 419 days. He spent approximately sixty-five days, or fourteen percent, of this time doing welding work in the repair of offshore structures, which involved use of a jack-up vessel. Additionally, he worked twenty-nine days repairing a drilling barge moored at an IMM dock in Louisiana and six days repairing a barge located in the Gulf of Mexico. The remainder of Lormand's work for IMM was land-based.

Pursuant to a master service contract with Superior, for the nine months preceding Lormand's injury IMM had been providing welding and construction services on various stationary drilling platforms owned by Superior and located in the Gulf of Mexico. To assist IMM in performing these services, Superior had also contracted with Aries for use of the RAM–V, one of the jack-up vessels owned by Aries. The RAM–V provided transportation for IMM welders and riggers to various Superior platforms, as well as living quarters, meals, and an alternate work space.

On November 14, 1982, IMM assigned Lormand to a work crew already aboard the RAM–V. The IMM crew was in the process of constructing an extension to be welded onto one of Superior's fixed platforms. Since the platform was small, the welders prefabricated the extension structure aboard the RAM–V and made only tie-in welds from the platform itself. In the evening of November 16, 1982, prefabrication had been completed and the RAM–V was elevated from its fixed position at the Superior platform to a level ten feet above the surface. Once the RAM–V was fixed into position, its gangway was

---

1. Lormand's "Statement of Issues" in his appellant's brief includes an issue relating to the liability of Superior. However, as Superior points out in its appellee's brief, nowhere in appellant's brief is there one word of argument, or citation of authority, concerning this issue.

It is simply not briefed. Moreover, appellant's reply brief totally ignores the issue. In these circumstances, we regard the issue as waived. *See e.g., Morrison v. City of Baton Rouge,* 761 F.2d 242, 244 (5th Cir.1985).

lifted by crane and placed between the RAM–V and the platform. IMM riggers then physically detached the gangway from the crane and placed it down.

From the vessel's wheelhouse, the RAM–V captain, who was an Aries employee, observed the placement of the gangway. Noticing that no one tied the gangway to the platform, he descended and informed someone on deck that it had not been tied. He was told that because the IMM crew would be welding for less than an hour, it did not need to be tied. The captain concurred that the untied gangway would not present a hazard for this limited amount of time and retired to his cabin for the evening.

Soon after this conversation, the IMM welding crew began attaching the prefabricated extension to the platform. Lormand assumed a work position that required him to stand on the gangway. After he had been welding for roughly two hours, the gangway separated from the platform, causing Lormand to fall ten to fifteen feet into the water. From this fall Lormand allegedly sustained the injuries for which he sued.

Lormand filed suit in the Western District of Louisiana, claiming damages under the Jones Act, general maritime law, and Louisiana law, for negligence and unseaworthiness. Lormand sued his employer, IMM; the owner of the RAM–V, Aries; and the platform owner, Superior. The district court granted summary judgment in favor of IMM on the issue of Lormand's status as a seaman under the Jones Act, and dismissed IMM as a defendant. Following a bench trial on the remaining issues, the district court found that there

was no evidence of negligence by Superior; that Lormand's claims against Aries were limited to those provided by section 905(b) of the LHWCA, 33 U.S.C. § 905(b) (1982)[2]; and that Aries violated no duty owed to Lormand under section 905(b). The district court therefore rendered judgment in favor of Superior and Aries, dismissing Lormand's claims. Lormand brings this appeal.

**Discussion**

*Seaman Status*

■ The test for seaman status under the Jones Act is well established in this Circuit. Sitting en banc in *Barrett v. Chevron, U.S.A.*, 781 F.2d 1067 (5th Cir. 1986), we recently reaffirmed the two-part test set forth in *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.1959). A worker claiming seaman status must establish (1) that he is assigned permanently to a vessel in navigation or performs a substantial part of his work on a vessel or fleet of vessels[3] and (2) that his work contributes to the function of the vessel or to the accomplishment of its mission. *Barrett*, 781 F.2d at 1072–74; *see also Smith v. Odom Offshore Surveys, Inc.*, 791 F.2d 411, 415 (5th Cir.1986). The question of seaman status under the Jones Act is usually a question of fact for the jury; however, where there is no reasonable evidentiary basis to support a jury finding that the injured worker is a seaman, summary judgment denying seaman status is proper. *Garret v. Dean Shank Drilling Co.*, 799 F.2d 1007 (5th Cir.1986); *Reynolds v. Ingalls Shipbuilding Division*, 788 F.2d 264, 267 (5th Cir.), *cert. denied,* —— U.S.

---

**2.** In the 1972 amendments to the LHWCA, Congress abolished the longshoreman's right to recover for unseaworthiness. Act of Oct. 27, 1972, Pub.L. No. 92–576, 86 Stat. 1263 (current version at 33 U.S.C. § 905(b) (1982)). Moreover, section 905(b) of the LHWCA makes its remedy "exclusive of all other remedies against the vessel." The LHWCA defines "vessel" to include the owner of the vessel. *See* 33 U.S.C. § 902(22). Hence, the district court properly limited Lormand's claim against Aries to the negligence claim provided for by section 905(b).

**3.** We explained in *Barrett* that "[b]y fleet, we mean an identifiable group of vessels acting

together or under one control." 781 F.2d at 1074. We rejected there "the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard. Unless fleet is given its ordinary meaning, the fundamental distinction between members of a crew and transitory maritime workers such as longshoremen is totally obliterated." *Id.; accord Waguespack v. Aetna Life & Casualty Co.*, 795 F.2d 523, 526 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1309, 94 L.Ed.2d 163 (1987).

——, 107 S.Ct. 278, 93 L.Ed.2d 253 (1986); *Barrett,* 781 F.2d at 1074.

■ Since the first prong of this test is disjunctive, a worker may qualify as a seaman, even though he has not been permanently assigned to the crew of the vessel, if he does substantial work on the vessel. *See Pickle v. International Oilfield Divers, Inc.,* 791 F.2d 1237, 1239 (5th Cir.1986) (quoting *Barrett,* 781 F.2d at 1073), *cert. denied,* —— U.S. ——, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). In *Barrett,* we considered the duration and nature of the employee's assignment necessary to submit to the jury the question whether he performed a substantial portion of his duties aboard a vessel. We stated that where "the employee's regularly assigned duties require him to divide his time between vessel and land (or platform)," his status is to be "determined 'in the context of his entire employment' with his current employer." *Barrett,* 781 F.2d at 1075 (quoting *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342, 1347 (5th Cir.1980)). As we noted, this rule applies unless the employee's permanent job assignment has changed during the course of employment by his present employer. *Id.* Only in this latter situation is the employee entitled to have the substantiality of his vessel-related work assessed on the basis of a time period other than his entire term of employment by that employer.

Applying these principles to *Barrett*'s facts, we held that as a matter of law, Barrett was not a seaman. 781 F.2d at 1076. Barrett's employer had contracted with Chevron, U.S.A. to provide welding crews for maintenance and repair work to offshore platforms in Chevron's Bay Marchand Field in the Gulf of Mexico off the Louisiana coast. *Id.* at 1068. When injured, Barrett, a welder's helper, had been working for his employer for approximately a year. Over the course of his employment, Barrett had been assigned to differ-

ent Chevron platforms and ordinarily worked on a particular platform until repairs on it were completed. At the time of his injury, Barrett had been assigned to a work crew responsible for repairing a very small offshore structure owned by Chevron. *Id.* at 1069. Because the structure was so small, Barrett's employer provided the crew with a jack-up barge for eating, sleeping, and work space. Although Barrett had spent seventy to eighty percent of his time on this assignment prefabricating new pipe aboard the jack-up barge, during the entire term of his employment he had worked aboard vessels only twenty to thirty percent of the time. *Id.* at 1076. We determined that since Barrett's employment duties as a welder's helper in Chevron's Bay Marchand Field did not significantly change during the term of his employment, assessment of his vessel-related duties for a period shorter than his entire employment was unwarranted. We concluded that based on the entirety of his employment, Barrett had not performed a substantial part of his work on vessels and, therefore, that he was not a seaman within the meaning of the Jones Act. *Id.*

■ Similarly, in this case, the district court found that Lormand was neither permanently assigned to, nor performed a substantial part of his work aboard, a vessel or fleet of vessels.[4] Lormand contests these findings. Although he concedes that summary judgment denying him seaman status may be proper if the entire term of his employment by IMM is considered, Lormand argues that he was permanently assigned to the RAM–V and, therefore, was entitled to have the substantiality of his vessel-related work assessed only for the duration of that assignment. He argues further that since he was assigned, on November 14, 1982, to join the crew on the RAM–V until the job was completed, this was an assignment of indefinite duration

---

4. As we explained in *Barrett,* since several Supreme Court cases, *see Butler v. Whiteman,* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958); *Grimes v. Raymond Concrete Pile Co.,* 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958); *Gianfala v. Texas Co.,* 350 U.S. 879, 76 S.Ct. 141, 100

L.Ed. 775 (1955), dictate that "aid in navigation" must be broadly interpreted, the second prong of the *Robison* test is easily satisfied. *See Barrett,* 781 F.2d at 1073. No one has disputed on appeal that Lormand satisfied the second prong of *Robison.*

and, consequently, a new permanent assignment.[5]

■ The close parallel between the *Barrett* facts and Lormand's situation leads us to reject Lormand's argument. Like Barrett, Lormand did welding work pursuant to his employer's contract for maintenance and repair services on fixed platforms owned by an oil company (here, Superior). Over the course of their employment, both Lormand and Barrett had been assigned to work on several different platforms. Lormand's latest assignment involved substantial work aboard a vessel, as did Barrett's, but Lormand's job duties as a welder remained essentially unchanged.[6] Hence, like Barrett, Lormand was not entitled to have the substantiality of his work aboard vessels assessed only for the duration of his latest specific work assignment.

Considered, as it must be, in the context of the entire thirty-four-month period of his employment by IMM, Lormand performed only fourteen percent of his work activity aboard vessels. Since Lormand spent proportionally even less time working on a vessel than did Barrett, our decision in *Barrett* compels us to agree with the district court that Lormand presented insufficient evidence to support submission of the question of his status as a seaman to the jury. We therefore affirm the district court's summary judgment against Lormand on the seaman status issue.

*Vessel Owner Negligence*

■ Recovery for injury to a person, other than a Jones Act seaman, working on the outer continental shelf is governed by the LHWCA, 33 U.S.C. §§ 901–950 (1982). Section 905(b) of the LHWCA permits a worker to recover from a vessel owner for personal injury "caused by the negligence of [the] vessel." 33 U.S.C. § 905(b) (Supp. II 1984). For such negligence to have occurred, however, the vessel owner must have violated a duty owed to the injured worker.

In the context of liability under the LHWCA by a vessel owner for injury to a stevedore's employee working aboard the vessel, the Supreme Court has articulated several principles that govern the scope of the vessel owner's duty. *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Although *Scindia* discussed the respective duties of a vessel owner and stevedore, our subsequent jurisprudence has made it clear that the rationale of *Scindia* applies equally to questions of vessel owner liability for injuries to LHWCA-covered employees of an independent contractor working aboard the vessel. *See Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir.1982). Thus, the distribution of duty between a vessel owner and stevedore outlined in *Scindia* also governs the scope of Aries' duty, as owner of the RAM–V, to

5. In his appeal to this Court, Lormand argues that because IMM assigned him to join the work crew aboard the RAM–V for an indefinite period of time and because, unlike his prior assignments, this one required him to fabricate pipes aboard ship instead of on the platform, his assignment to the RAM–V was a new, permanent assignment. *Cf. Barrett*, 781 F.2d at 1075–76. An affidavit submitted by IMM in support of its summary judgment motion, however, stated that the job was completed on November 18, only two days after Lormand's injury. Additionally, Lormand stated in his deposition that he remained with the IMM crew until the work was completed on November 18. Thus, the uncontroverted evidence presented at the time of the summary judgment motion was that Lormand was assigned to a job that IMM expected to last four to five days, and which in fact lasted only four days. Hence, the evidence indicates that Lormand's assignment was for a relatively definite period of short duration. Even if Lor-

mand's assignment to the RAM–V had been for an indefinite period, an indefinite assignment does not automatically make it "more or less" permanent; rather, it is only a factor to be considered in making that determination. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 534 (5th Cir.1986).

6. Although *Barrett* allows for assessment of "substantial work" over a period shorter than entire employment when an employee receives a new assignment that permanently changes his "essential duties," Lormand's duties changed no more than Barrett's did. Unlike the situation in some of their previous assignments, on the assignment during which they were injured both Barrett and Lormand had to fabricate pipes on the jack-up vessel. *Barrett*, 781 F.2d at 1076. However, like Barrett's, Lormand's job duties continued to require him to perform welding and welding-related tasks and, thus, remained essentially unchanged.

Lormand, as an LHWCA-covered employee of an independent contractor, IMM, who was injured while working aboard a barge.

■ The Court in *Scindia* explained that at the outset, prior to commencement of the worker's operations, the shipowner has a duty to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." 101 S.Ct. at 1622. The shipowner also has a duty at the outset to warn the stevedore or independent contractor of hidden dangers. *Id.; Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir.1986). Once the employees of the stevedore or independent contractor begin working, however, the vessel owner has no general duty to discover dangerous conditions that develop within the confines of their operations. *Scindia*, 101 S.Ct. at 1624; *Futo v. Lykes Bros. Steamship Co.*, 742 F.2d 209, 213 (5th Cir.1984). The Court specifically relieved the vessel owner of any duty, absent custom, law, or contractual provision to the contrary, to inspect or supervise the operations of the stevedore's or independent contractor's employees. *Scindia*, 101 S.Ct. at 1624.

■ *Scindia* also created an exception to these principles, however, finding that where two conditions are present, a vessel owner retains a duty to intervene with respect to obvious dangers that arise in areas outside his control and after the workers' operations have begun. This duty attaches only when the vessel owner has (1) actual knowledge that a dangerous condition exists and (2) actual knowledge that the stevedore or independent contractor, or its employees, cannot be relied upon to remedy the condition, and that if unremedied it will pose a substantial risk of injury. *Id.* at 1626–27; *Barrios v. Pelham Marine, Inc.*, 796 F.2d 128, 131 (5th Cir.1986).[7]

■ The issue in this case is whether the captain of the RAM–V, and hence Aries, negligently failed to ensure that the vessel's gangway was tied. The district court found that

"[i]t was the established practice and procedure that when the M/V RAM V was brought into position alongside a platform the IMM crew, using the barge's crane, would set the barge's gangway in place between the barge and the platform and the first IMM rigger to cross the gangway would tie off the end of the gangway on the platform to the platform. All persons on hand were aware of this practice and procedure."

Thus, the district court reasoned that Aries had no general duty under *Scindia* to discover and correct dangerous conditions that might have developed due to the untied gangway; instead, Aries' duty was limited to the exception expressed in *Scindia* for dangers that develop after the workers' operations have begun and in areas not under the vessel owner's control.

Lormand does not contest these findings. He does contend, however, that Aries violated its limited duty to him under the *Scindia* exception. He argues that since the captain knew that the IMM riggers had not tied the gangway and that they intended not to tie it, the two actual knowledge prerequisites of *Scindia* were met and, therefore, that Aries violated its duty to intervene to protect IMM's employees.

The district court found to the contrary, however, that the RAM–V captain lacked the requisite knowledge that a hazard was present and, consequently, that he was not negligent in failing to intervene.[8] While

7. We have repeatedly applied these standards in this Circuit. *See Theriot*, 783 F.2d 527 at 535; *Futo*, 742 F.2d at 216; *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 298–99 (5th Cir.1984); *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th Cir.1983); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir. 1983); *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1247 (5th Cir.1982); *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 115 (5th Cir.1981).

8. The district court found that

"[t]he captain of the M/V RAM V noticed from the wheelhouse that the gangway was not tied, went on deck and spoke to IMM personnel concerning the fact that it was not tied. He was told by the personnel of IMM

we might have evaluated the evidence differently, we cannot say that the district court's findings are clearly erroneous.[9] On this record, the district court could properly conclude that the dangerous condition at issue was not simply that the gangway was not initially tied, but that it remained untied long enough to present a hazard of falling while an IMM employee was working on it. The relevant hazard was not using the gangway as a ship's gangway, but its subsequent use, untied, by IMM as a special work station for its employees. Cf. Futo, 742 F.2d at 219–20 (holding that dangerous condition was not just that scaffold lacked guardrail at some point during stevedoring operations, but that it had no guardrail while employees were using it as a work platform). Although the captain knew that no one tied the gangway when it was placed down, he was told that because the welding work would be completed in less than an hour, the gangway would be safe for the period the workers would be walking across it.[10] Under these circumstances, we cannot say that the district court was clearly erroneous in not finding that the captain was negligent in failing to initially require that the gangway be tied.

Even assuming, as Lormand argues, that the captain of the RAM–V must have known that over an hour had passed and yet the welding work continued, nothing in the record suggests that he knew the gangway had not been tied in the interim. Only if the captain had such knowledge could Aries have violated its duty to Lormand. Scindia imposes no duty on a vessel owner to monitor an independent contractor's operations for development of hazardous conditions. The evidence supports a finding that the captain lacked knowledge that the gangway had not been tied even after an hour passed and that he had no reason to know a welder would be working on the gangway over two hours later, even if he knew an hour had passed. Accordingly, the record does not compel the conclusion that the captain knew IMM workers were likely using the gangway, without having tied it, at a time when there was a danger it would fall.

Moreover, there is no evidence that the RAM–V captain knew IMM welders were going to use the gangway as a welding platform, which is how Lormand was using it when it fell. Even if, as Lormand argues, the captain must have known that the platform work continued for longer than the hour during which the untied gangway did not present a hazard, the record does not compel the conclusion, asserted by Lormand, that the captain knew an IMM employee was likely working on the gangway then. If the gangway had been used, as it normally was, only as a passageway between the vessel and the platform, then even if work on the plat-

platform for longer than an hour. Since several witnesses testified that Lormand fell more than two hours after the gangway was placed, the evidence also supports the district court's finding that the gangway fell more than an hour after its placement.

Lormand makes much of the fact that Aries failed to establish at trial that it was an IMM employee who told the captain that the work would last less than an hour and that the untied gangway would be safe for that long. The evidence in the record shows, however, that besides the captain, Aries had only a cook and a deckhand aboard the RAM–V. Other than IMM personnel, no one else was aboard. The evidence indicates that neither of these Aries crew members were on deck when the captain was told that the IMM welders would be finished in less than an hour. Hence, the record supports the district court's finding that the captain spoke with IMM personnel.

with whom he spoke that it had not been tied in place because the job would not take more than an hour and it was the IMM employee's opinion that enough of the gangway extended onto the platform that it would be safe without tying for that period. The captain then surveyed the situation and agreed that, for the period of an hour, the gangway was safe without being tied. He then retired to his cabin to sleep and the IMM personnel continued their work."

9. Since the question of negligence in maritime cases is a factual issue, unless the district court's finding was clearly erroneous, it cannot be disturbed on appeal. Barrios, 796 F.2d at 132; Theriot, 783 F.2d at 535; Valley Towing Service, Inc. v. S.S. American Wheat Freighters, Inc., 618 F.2d 341, 346 (5th Cir.1980).

10. The evidence shows that the captain retired to his cabin once the work began; hence, it provides some support for a finding that he did not know that IMM workers remained on the

form continued for several hours, as long as the gangway was tied before the workers used it to return to the vessel, the untied gangway would present no hazard in the interim. Thus, even assuming the captain knew that more than an hour had passed, the record does not necessitate the conclusion that he knew a dangerous condition had developed. Further, Lormand had the burden of proof and of persuasion on these issues. We cannot say that the district court was required to find that Aries had the requisite knowledge under *Scindia* for imposition of liability against it as owner of the RAM–V.

Accordingly, we determine that the district court's finding of no negligence was not clearly erroneous and affirm its holding dismissing Lormand's section 905(b) claim against Aries.

### Conclusion

Lormand did not perform a substantial portion of his work for IMM aboard a vessel or fleet of vessels; therefore, he was not a seaman within the meaning of the Jones Act. Additionally, the district court's factual finding of no section 905(b) negligence on the part of Aries is not clearly erroneous. The judgment of the district court is therefore

AFFIRMED.

JOHN R. BROWN, Circuit Judge, concurring:

I Concur. I concur fully in the Court's opinion denying *Robinson-Barrett* seaman's status. With less enthusiasm, I concur in denial of § 905(b) relief from Aries, the vessel owner. I concur solely because the gangway was not being used—or intended by IMM to be used—as a gangway. Rather it was used—and intended to be used—as a work platform by welders. No Captain in his right mind could think allowing a gangway to be unsecured for an hour could satisfy the demanding standards of the general maritime law as far back as the Laws of Oleron, the Jones Act, or even *Scindia*'s treatment of § 905. And under no circumstances would he be permitted to retire to much needed sleep confident that somehow, someone—not asleep—would become conscious that for the gangway to be safe as ingress or egress from the vessel, it would now have to be securely fastened. Whether characterized as seaworthiness or unseaworthiness, failure to establish this would be such glaring fault that neither § 905 or *Scindia,* not even F.R.Civ.P. 52(a) could ever rescue the vessel from the maritime inexorable decree of absolute liability.

ALVIN B. RUBIN, Circuit Judge, concurring:

While I continue to hold the views stated in my dissent from the majority opinion in *Barrett v. Chevron, U.S.A., Inc.,* 781 F.2d 1067 (5th Cir.1985) (en banc), the test applied in that opinion is now the law of the circuit, and I, therefore, concur.